liKLEES, Judge.
On September 30, 1993 the appellant, Richard Lacey, was charged by bill of indictment with second degree murder of Harold Henderson, Jr. A trial was held on January 11,1994, which resulted in a hung jury. The appellant was retried on May 11-12, 1994, at which he was found guilty of the lesser offense of manslaughter. A hearing was had on July 28, 1994, at which the district attorney was permitted to put forth victim impact testimony. On August 5, 1994 the appellant was sentenced to serve eighteen years at hard labor.
After the record was lodged in this court, appellant’s counsel subsequently filed a motion to supplement the record and suspend the briefing schedule, which motion was granted. The record was thereafter supplemented on July 7, 1995 with a volume containing transcripts of the voir dire, opening statements and closing arguments. On August 7 counsel submitted a brief containing two arguments which encompass ten of the twelve original assignments of error as well as two supplemental assignments of error.[1] Because the brief raised the issue of the appellant’s sentence, on September 15, 1995 the record was supplemented with transcripts of the sentencing and victim impact hearings.

FACTS

On August 2, 1993, appellant Richard Lacey fatally shot his across-the-street neighbor, Harold Henderson, Jr. The appellant contends that he shot the decedent in defense of his mother and younger brother.
12Pebra Lacey and her family moved to their Boston Drive home in 1991. The Lacey family consisted of Mrs. Lacey, her oldest son, Richard, her next oldest son, Robert, a nephew, Tim, and three younger children. As brought out by the defense, there had been bad blood between the Laceys and the decedent for some time prior to the shooting.
The decedent and Robert Lacey had been involved in an altercation in May of 1992, in which the decedent, then forty-one, beat up the considerably younger Robert, then fifteen. The decedent’s father and another state witness diminished the extent of the beating and alleged that Robert began the dispute. The triage nurse and hospital medical records supported that Robert was injured. As a result of the beating, Debra Lacey brought a battery charge against the decedent in Municipal Court. The decedent pled guilty to the charge on January 20, 1993. Sentencing was deferred.
Defense witnesses testified that, on the night of January 20, the decedent threatened them with a gun pointed across the hood of his ear towards Robert, Tim and Richard. Mrs. Lacey called the family lawyer, Craig Sussaman, who went to court the next morning and obtained an attachment which resulted in the decedent’s arrest.
On July 20, 1993, the decedent was sentenced to one year’s probation and placed under a peace bond. Robert Lacey was out-of-town, working for his uncle in Houston, at that time. August 2, 1993, the date of the shooting, was the first time Robert saw the decedent since his return.
The events which led directly to the shooting began when Robert drove up in a car with Richard and Tim. Richard and Tim went into their house, but Robert remained outside. He crossed the street to the Henderson side to talk to some young girls, Leslie McDaniels and Sabrine Johnson. As they passed the Henderson residence, the decedent came out of his house and began *1306 walking to his hear and mumbling something. According to neighbor Louis Magee, Jr., the girls tried to pull Robert back to his side of the street, but he ran over to the decedent. Magee told Robert to remember that his mother was inside sick, then went over to the decedent and told him to “cool it,” while another neighbor, Byron Paine, went to tell Mrs. Lacey that there was a problem.
Debra Lacey and Tim came out first. Debra Lacey had words with the decedent and threatened to call the police. Richard came outside, too, after first retrieving a firearm from under the sofa. He came out eating olives from a glass, with the firearm in his pocket. He fired five shots, one of which hit the decedent in the head and was fatal. The decedent was shot while seated in the driver’s seat of his car with his left leg outside the car. Other bullets hit the window of another car, made a hole in the driveway fence, and made a hole in the top of a front window of the Henderson home.
The testimony relative to the moment of the shooting and the aftermath is conflicting. The state witnesses claim that the decedent was sitting erect when he was shot, that he slumped over from the gunshot. They did not hear the decedent utter any threatening words. At least two state witnesses heard Mrs. Lacey call out “murderer, now you’re going to jail,” to Richard after the shooting. Louis Magee testified that he was there by the car until the police arrived, that only the decedent’s father went to the car to comfort his son, and that nothing was removed. The police found no weapon in the decedent’s ear.
The defense witnesses heard the decedent say “I got something for you all,” saw him reach down for something, and saw the shooting as the decedent came up. They did not hear Mrs. Lacey call her son a murderer, but they did see someone go to the car and walk away as if he was carrying something. They also saw someone come out of the Henderson’s house with a weapon after the shooting.
_yAfter the shooting, Robert and Tim Lacey went back into the house with Mrs. Lacey. Richard fled. He turned himself in to the police the next day.

ERRORS PATENT REVIEW

A review of the record for errors patent reveals that there were none.

ARGUMENT ONE

The appellant first argues that the state’s introduction of irrelevant, inadmissible, and hearsay evidence calculated to paint the defendant and his family as bad people, and its exploitation of that evidence in closing argument, denied defendant a fair trial. The appellant cites various particular instances of this alleged introduction of inadmissible and prejudicial evidence.
The first instance of alleged hearsay evidence is the state’s reference to a petition of neighbors seeking to have the Laceys relocate. It was purportedly confected and circulated in the appellant’s neighborhood prior to the shooting of the decedent. The petition was first used on cross-examination of Debra Lacey. Its purpose was to show that the decedent was not necessarily the aggressor in the prior conflicts between the decedent and Robert Lacey. It was used to rebut Mrs. Lacey’s testimony that the decedent’s hostility to her family was unprovoked. Mrs. Lacey denied knowing that her neighbors had grouped together to get her to leave the neighborhood. Considering that the defense urged by the appellant was self-defense, by showing the dangerous propensity of the victim towards the appellant’s family, the petition was clearly relevant to rebut this theory.
As to the hearsay argument, the allegations of the petition were not read to the jury. Rebuttal witness Louis Magee did sign the petition and read its title. As such, it was not hearsay, at least as to his signature. It remained a hearsay document as to the other signees. However, considering the other evidence against |sthe appellant, in that all the confrontations, including the final one, occurred on the Henderson side of the street, the jury would have concluded, without refer *1307 ence to the petition, that the Laceys were not wholly innocent in the altercations. Thus, because the allegations contained within the petition were not read to the jury, any error from reference to the petition itself was harmless.
The appellant further objects to the demonstration of a gun, purportedly possessed by the appellant’s brother Robert. This evidence was used on cross-examination, after Robert indicated that he had never possessed a weapon. Because the defense had shown the violent propensities of the decedent toward Robert, in making its case of self-defense or defense of others, the state was attempting to counter that case by showing that Robert Lacey also had violent propensities, thus leaving the jury to conclude that he may have instigated the various altercations. Questioning Robert as to his possession of a gun was thus relevant.
The trial judge concluded that the presentation of the gun itself was prejudicial and so admonished the jury upon the defense’s objection. However, the court refused to grant a mistrial. As noted by the court, the gun presented was not ever alleged to be a gun owned or used by the appellant. Because Robert’s possession of a gun was relevant to establish that he may have instigated the various altercations, presentation of the gun to impeach his denial that he had ever possessed a firearm should not require a mistrial.
The appellant further complains about a reference to other crimes committed by Robert Lacey. La.C.Cr.P. art. 770(2) prohibits reference, within the hearing of the jury, by the judge, district attorney, or a court official, to “another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.”
|6The prosecutor questioned Robert Lacey as to why he was not able to return to Brother Martin High School. When the witness testified that he was out of school for two months because he was in jail following his arrest, the prosecutor pressed him as to whether the jail time was on the instant case. The appellant contends that the question was an indirect reference to other crimes committed by the witness. It may have been. However, even if such a subtlety were recognized by the jury, it would not have required a mistrial because it did not refer to another crime committed by the appellant.
The appellant further argues that the prosecutor made a reference, in cross-examination of the Lacey family lawyer, to other crimes committed by the appellant. The complete cross-examination of the witness was as follows:
EXAMINATION BY MR. COLLINS (THE PROSECUTOR):
Q Sir, how did you become involved with the Lacey family?
A I represented Mrs. Lacey’s son, Clark, who was struck by a 18-wheeler.
Q It was a personal injury action?
A Yes.
Q Have you represented any of her family in any kind of criminal action?
A I’ve represented them for years on everything that came up in their family.
Q Could you tell us what you represented the defendant on?
BY MR. REED:
May we approach the bench?
BY MR. COLLINS:
Your Honor, I’d like to go on with my question. The door is open. He put the family attorney on.
BY THE COURT:
Well, you better come over here.
^REPORTER’S NOTE:
All counsels approached the bench for a brief conference.
EXAMINATION RESUMED BY MR. COLLINS:
Q Did you represent this gentleman on this charge?
*1308 A No.
Q Not at all?
A No.
BY MR. COLLINS:
Nothing further.
BY MR. REED (DEFENSE COUNSEL):
Nothing further.
(Tr., Vol. 3, pp. 133-134).
Neither the questioning nor the answers indicate that the appellant was represented by the witness for a criminal case, though the witness’ answer suggests that some member of the family may have been so represented. Because the witness was prevented from answering the question about other representation of the appellant, there was no evidence of other crimes by the appellant presented to the jury, and thus no prejudice.
Finally, the appellant contends that the prosecutor’s closing argument improperly suggested that the state had other evidence of guilt which it was unable to present to the jury. The appellant then recites several references which are alleged to be objectionable. As correctly noted by the state, only one objection was made for the record, relative to the neighbors’ petition, as follows:
BY MR. COLLINS:
... Seven of the ten addresses on that petition to have that family removed from the neighborhood, which was signed before all this stuff started, before all of it, but from that very block. And it’s not the Hendersons they’re trying to have removed, but the Laceys because of the actions of their sons, because of other reasons I can’t get into.
BY MR. REED:
|gl object, Your Honor. There’s nothing of that, and that, and that’s an impermissible argument. I ask that the jury be admonished an disregard these references [to] “other evidence.”
BY THE COURT:
Remember what I told you about these men advocating their different positions. Take it for what it’s worth and not for what it’s worth. It’s not evidence. Now, you remember what you heard and what you didn’t hear from the witnesses, and you remember what was introduced and what was not introduced. And, of course, you cannot go beyond the evidence. And I’ll tell you about that hopefully very shortly.
(Tr., Vol. 3, p. 222; Supp.Vol. pp. 30-31).
The denial of a mistrial upon motion by a defendant complaining of a remark reprobated by Article 770 is per se a substantial violation of the defendant’s rights. State v. Green, 315 So.2d 763 (La.1975); State v. Andrews, 527 So.2d 411 (La.App. 4th Cir.1988), writ denied, 532 So.2d 176 (La.1988). However, in the instant case, the appellant did not request a mistrial, only an admonishment, which was given by the court. The reference is therefore considered under a harmless error analysis.
The reference was general as to the “actions” of the Laceys “sons,” and suggested more in the nature of harassment than crimes. The state’s argument that the La-ceys had instigated the prior violent behavior of the decedent was proper rebuttal to the appellant’s claim of self-defense and defense of others. The state’s excess remark that the petition was for “other reasons I can’t get into,” was clearly beyond the scope of the evidence. However, the fact that the Laceys took the altercations to the Henderson side of the street, the further fact that the appellant fired five shots at the decedent, and the fact that no weapon was found in the decedent’s vehicle, would lead a jury to reasonably conclude that the shots were fired in the heat of passion, rather than in defense of the appellant’s family. We ^conclude that the prosecutor’s improper remark in rebuttal argument did not affect the verdict.
The assignments raised in appellant’s first argument present no reversible error.

ARGUMENT TWO

The appellant next argues that his sentence of eighteen years at hard labor is unconstitutionally excessive. The imposition of a sentence, although within the statu *1309 tory limit, may violate a defendant’s constitutional right against excessive punishment. State v. Cann, 471 So.2d 701 (La.1985); State v. Thomas, 447 So.2d 1053 (La.1984); State v. Francosi, 511 So.2d 1181 (La.App. 4th Cir.1987). A sentence which appears to be severe is considered excessive and unconstitutional if it is grossly out of proportion to the severity of the crime or nothing more than the purposeless and needless imposition of pain and suffering. State v. Brogdon, 457 So.2d 616 (La.1984), cert den., Brogdon v. Louisiana, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985); State v. Telsee, 425 So.2d 1251 (La.1983). At the time of the appellant’s sentencing, a sentencing judge was required to consider the guidelines, but the guidelines recommendation was merely advisory. State v. Smith, 93-0402 (La. 7/5/94), 639 So.2d 237.[2]
At sentencing, the trial judge noted that the statutory range for the appellant’s offense was zero to forty years. He further noted that, due to the appellant’s status on probation for a drug offense, the pre-sen-tence investigation report recommended against probation. The trial judge further noted the sentencing range recommended by the sentencing guidelines was eight to ten and one-half years, and gave his reasons for exceeding the maximum recommended.
| ipThose reasons were, the preciousness of life, the fact that he did not believe the defendant on the stand, and that any lesser sentence would deprecate the seriousness of the offense.
Considering that the sentence imposed is less than half the maximum allowable for the offense and further considering the facts of the case, the sentence imposed is not constitutionally excessive. This assignment is without merit.
Accordingly, for the reasons stated the conviction and sentence of Richard Lacey are hereby affirmed.

AFFIRMED.

. On April 5 the appellant filed a copy of the twelve assignments of error submitted to the trial court. On August 8 the appellant submitted two additional assignments of error, one of which concerned the appellant's sentence.

. By Act 942, effective August 15, 1995, the 1995 Legislature repealed the sentencing guidelines and reenacted the court's sentencing basis to the statutorily enacted considerations for imposing either incarceration or suspension of sentence.